# IN THE COURT OF APPEALS OF IOWA

————————————

No. 25-1940
Filed January 28, 2026

————————————

**In the Interest of P.S., Minor Child,**

**J.S., Father,**
Appellant,

**C.G., Mother,**
Appellant.

————————————

Appeal from the Iowa District Court for Dubuque County,
The Honorable Thomas J. Straka, Judge.

————————————

**AFFIRMED**

————————————

Tyler Ries of Reynolds & Kenline, L.L.P., Dubuque,
attorney for appellant father.

Bridget L. Goldbeck of Hughes & Trannel, P.C., Dubuque,
attorney for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney
General, attorneys for appellee State.

Patricia Reisen-Ottavi of Ottavi Law Firm, Dubuque, attorney
and guardian ad litem for minor child.

————————————

Considered without oral argument
by Greer, P.J., and Schumacher and Chicchelly, JJ.
Opinion by Greer, P.J.

**GREER, Presiding Judge.**

A mother and father separately appeal the termination of their parental rights to one child. Conceding that the grounds for termination were met, both parents argue that termination was not in the child's best interests and that they should be given an additional six months to work toward reunification. On our de novo review, we affirm the termination of their parental rights.

### I. Background Facts and Proceedings.

The child, P.S., was born in January 2025, testing positive for amphetamines, fentanyl, and opiates. The child was admitted to the NICU for feeding delays, most likely due to drug exposure in utero.

The mother, thirty-seven years old, and father, forty-one years old, both have at least a decade-long history of methamphetamine use. The mother began using methamphetamine when she was thirteen years old. She had almost a ten-year period of sobriety that ended around the time she met the father eleven years ago. Since then, her longest period of sobriety had been just under six months. She had not held a stable residence of her own in approximately seven years.

Since he began using methamphetamine, the father's longest period of sobriety was eight months and occurred when he was living in a halfway house. Outside of a structured environment, the father's longest period of sobriety was a couple months. In addition to his substance use, the father had also spent the better part of a decade in and out of jail and prison for various crimes, many of which were drug related. In the past ten years, the father's longest period without being incarcerated was four months. The father had not had housing of his own in ten years.

The day after the child was born, the Iowa Department of Health and Human Services (HHS) met with the mother and father. The mother admitted to using methamphetamine during her pregnancy. Both the mother and father admitted to using methamphetamine shortly before the child was born. The mother reported she had previously used methamphetamine intravenously, but she was now "hot railing," a combination of smoking and snorting it.

Both the mother and father acknowledged that they did not have suitable housing for the child because the mother was living with a relative who was a sex offender and the father, though living with his parents, had active warrants out for his arrest. The child was removed from his parents' custody on February 4 and placed with the mother's stepsister.

On February 5, the father was arrested. He remained incarcerated at various jails in Iowa and Wisconsin until August 8. While in jail, the father participated in virtual visits with the child. These visits lasted approximately ten minutes each.

In March, the child was adjudicated a child in need of assistance. The court ordered the parents to, among other things, cooperate with Family Centered Services (FCS), refrain from using drugs, comply with random drug-testing requirements, and undergo a substance-use evaluation.

The mother began participating in supervised visits with the child shortly after the child was removed from her custody. In March, the mother tested positive for methamphetamine. In late March, the mother moved into sober-living housing until she began inpatient substance-use treatment. The mother began inpatient treatment on March 31.

On May 1, the mother was successfully discharged from inpatient treatment and moved into another sober-living facility. However, in late May, the mother learned she had stage four cervical cancer. The stress of this diagnosis caused the mother to disengage with services and relapse on methamphetamine. She was kicked out of her housing on May 26 for noncompliance with the program's rules. She then moved into another sober-living home but was kicked out on June 4. After that, she moved back in with her relative for a period of time, then lived with a friend from Narcotics Anonymous, and then with various other friends, many of whom used methamphetamine.

The mother did not attend visits with the child from May 22 through the end of June. She missed several drug tests in May, June, and July. The mother reengaged in services and visits with the child on July 1.

On July 16, the State filed a petition to terminate parental rights. At a meeting with FCS the next day, the mother questioned why she was unable to have the child in her care while she was using methamphetamine. The mother expressed resistance to mental-health therapy, complaining she did not want to be someone's "guinea pig." Although she did not have housing, she did not want to live in a shelter and was reluctant to live in an apartment because she did not want to deal with neighbors. She also did not want to get an in-person job, did not want a service job because she did not like being bossed around, and did not want to work in general because she "want[ed] more out of her life than to work all the time."

The mother admitted to using methamphetamine on July 29. During an August 1 visit, the mother admitted she was struggling and did not have anywhere to live that would be appropriate for the child. Around this same

time, the mother reported she was getting money by gambling through an online casino.

On August 8, the father was released from jail and discharged from probation in Wisconsin. After his release from jail, the father began working for his parents, doing construction on their home, where he also lived. The father also began participating in supervised, in-person visits with the child.

On August 11, the father had a sweat patch applied, which was removed on August 18. The sweat patch was positive for methamphetamine.

On August 12, the father underwent a substance-use evaluation, which recommended partial hospital treatment, a step below inpatient treatment. On August 12 and 25 and September 5, the father underwent urinalysis drug testing, which was negative for all substances.

On September 11, the court held the termination trial. At trial, both the HHS social worker and the guardian ad litem recommended termination of the parents' parental rights.

At trial, the mother admitted that her most-recent methamphetamine use was "a couple weeks" before trial. She reported she was in substance-use treatment, but the HHS social worker had not been able to confirm that. She did not have stable housing or a job. She reported she had applied for disability benefits but did not know the status of her application.

The father testified that, despite the positive sweat patch, his most-recent methamphetamine use was in February before he was arrested. The father had completed the partial hospital program and had progressed to intensive outpatient substance-use treatment. He continued to live with and work for his parents.

After trial, the father submitted additional documentation showing that he had stipulated to a probation violation in a Dubuque County criminal case, was held in contempt, and was sentenced to sixty days in jail, with credit for time served. Due to the amount of time he had already spent in jail, he had satisfied his sentence and was discharged from probation.

After hearing all of the evidence, the court terminated both the mother's and father's parental rights under Iowa Code sections 232.116(1)(h) and (*l*) (2025). Both parents separately appeal.

## II. Standard of Review.

We review termination-of-parental-rights cases de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014) (citation omitted).

"We will uphold an order terminating parental rights if there is clear and convincing evidence of grounds for termination under Iowa Code section 232.116." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). "Evidence is clear and convincing when there are no serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence." *Id.* (cleaned up).

## III. Analysis.

On appeal, the parents do not dispute that the State proved the statutory grounds for termination. Instead, both parents argue that termination of their parental rights is not in the child's best interests. Both

parents also argue that they should be given an additional six months to work toward reunification. We will address both appeals in turn.

**A. Mother's Appeal.** The mother argues that termination is not in the child's best interests because she is affectionate and attentive to the child and there is a bond between them. The mother also argues she should be given an additional six months to work toward reunification.

"In considering whether to terminate the rights of a parent . . . the court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). "In determining best interests, we look to the child's long-range as well as immediate interests, consider what the future holds for the child if returned to the parents, and weigh the child's safety and need for a permanent home." *In re L.T.*, 924 N.W.2d 521, 529 (Iowa 2019) (cleaned up).

Despite the bond between the mother and child, we conclude that termination of the mother's parental rights is in the child's best interests. The mother has not adequately addressed her substance-use or her mental-health concerns, does not have stable housing or a job, and admitted to recent methamphetamine use at trial. Importantly, the mother had not taken steps to address her significant past trauma, which she acknowledged contributed to her substance use. Although we do not doubt that the mother loves the child, she is not in a place to ensure the child's safety, long-term nurturing and growth, or physical, mental, and emotional needs. *See A.M.*, 843 N.W.2d at 112 ("It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a

stable home for the child." (citation omitted)).  We conclude termination of the mother's parental rights is in the child's best interests.

For those same reasons, we decline to grant the mother a six-month extension of time to work toward reunification.  *See* Iowa Code § 232.104(2)(b) (noting the juvenile court may grant a six-month extension of time to work toward reunification only if it "determin[es] that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period").  Given the mother's current instability and the significant amount of work she still needs to do to be able to safely parent the child, we cannot conclude that the need for removal will no longer exist if the mother were given a six-month extension of time to work toward reunification.  *See D.W.*, 791 N.W.2d at 707 ("We do not gamble with the children's future by asking them to continuously wait for a stable biological parent, particularly at such tender ages." (cleaned up)).

**B.  Father's Appeal.**  The father argues that termination is not in the best interests of the child because he has a strong bond with the child.  The father also argues that, after his release from custody, he made strides to be an active and safe caregiver for the child.  Finally, the father requests a six-month extension of time to work toward reunification.

We find this to be more of a close call given the father's recent progress and the evidence developed at the termination trial.  Yet, we recognize that often we consider efforts made close to the termination trial to be "simply too late."  *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("[C]hanges in the two or three months before the termination hearing, in light of the preceding eighteen months, are insufficient.").  The father was just released from incarceration about a month before the trial, so he had never moved past semi-supervised visits and only had five visits since his release.

Still, since his release from incarceration, the father was attending an intensive outpatient program every weekday from 9 a.m. until 1 p.m., had a care navigator at the treatment program and an individual therapist. At the treatment program, the father provided urinalysis tests that were consistently negative for substances, but HHS mandated that he wear a sweat patch for a week in the middle of August and it tested positive for methamphetamine. The father denied use and offered to provide a hair sample for other testing, but HHS refused his request. And the State contended that the test results from the urinalysis did not conclusively rule out methamphetamine in the father's system because of the sensitivity settings for detection related to the particular test.

With that backdrop, we commend the father's progress since his release from jail and do not doubt his love for the child, but we cannot say he has solved his substance use issues on a long-term basis. So, we conclude that termination of the father's parental rights is in the child's best interests. The father had only been out of custody for approximately five weeks at the time of trial, and still there were concerns over his use of methamphetamine. Likewise, over the past ten years, the father has spent a significant amount of time incarcerated or otherwise dealing with criminal charges, mostly related to drug use. Importantly, the father also had not demonstrated the ability to remain sober for more than a couple months. The father had not progressed beyond supervised visits with the child and had not shown his ability to parent outside of a structured, supervised setting. On this record, we conclude that termination is in the child's best interests.

For those same reasons, we cannot conclude that the need for removal would no longer exist in six months. *See* Iowa Code § 232.104(2)(b); *see also D.W.*, 791 N.W.2d at 707 ("We do not gamble with the children's future by

asking them to continuously wait for a stable biological parent, particularly at such tender ages." (cleaned up)).  While the father has made progress, and argues that these changes are permanent, he has not demonstrated sufficient stability to guarantee that in six months the child could return to his custody. We decline to grant the father a six-month extension of time to work toward reunification.

## IV.  Conclusion.

We conclude that termination of the mother's and father's parental rights was in the child's best interests and an additional six months to work toward reunification would not resolve the concerns that brought the family to HHS's attention.  For those reasons, we affirm.

**AFFIRMED.**